IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 07-21-JJF |
| ) | |
| RICARDO ZANELA-CASTELAN, ) | |
| ) | |
| Defendant. ) | |

### RESPONSE TO DEFENDANT'S SENTENCING MEMORANDUM

Defendant Ricardo Zanela-Castelan pleaded guilty to Count I of the Indictment, which charged him with transporting illegal aliens for financial gain, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i). Under the terms of a plea agreement entered into between the parties, the Government agreed to dismiss Count III of the Indictment[1] and to recommend a term of imprisonment of 12 months and one day. That recommendation is at the low end of the applicable Guidelines range of 12 to 18 months, and it reflects the Government's consideration of the defendant's role in this serious alien smuggling offense. Defendant has filed a sentencing memorandum asserting that his minimal criminal history and his future removal from the United States as a result of this criminal conviction compels a sentence of time-served. Since defendant has been incarcerated on his federal criminal charges since January 17, 2007, his request essentially amounts to a sentence of four months imprisonment. Defendant is unable, however, to articulate to the Court why this significant downward variance – which is 67% less than the applicable advisory guidelines range – is warranted under 18 U.S.C. § 3553(a). United States v. Kononchuk, - - F.3d - -, 2007 WL 1322247 (3d Cir. May 8, 2007) (vacating a sentence issued by the district court where the

---

[1]Count III charged Zanela-Castelan with illegally entering the United States, in violation of 8 U.S.C. § 1325.

Government raised objections regarding a significant downward variance, and where the district court did not explain why the variance was justified by the record); see also United States v. Wallace, 458 F.3d 606, 614 (7th Cir.2006) (noting that a "'World Series' break" from the guidelines requires a "'World Series' explanation"). Indeed, the defendant has not posited why any variance is warranted here, since these factors are considered in the Guidelines calculation and apply to many similarly-situated defendants. Accordingly, the government asserts that a sentence of 12 months and one day, which is within the applicable guidelines range of 12 to 18 months imprisonment, is a reasonable sentence under 18 U.S.C. § 3553(a).

## I. BACKGROUND

The parties do not dispute the essential facts comprising Zanela-Castelan's offense conduct. In the plea agreement, and during the plea colloquy at his change of plea hearing, defendant admitted that he entered the United States illegally along with seventeen other illegal aliens in the area of Nogales, Arizona. The group was transported in a van from Arizona to St. Louis, Missouri. Once in St. Louis, defendant and his co-defendant, Pedro Hernandez-Sanchez, agreed to transport the other sixteen illegal aliens in a Chevrolet Express van from Missouri to New Jersey, in exchange for a 50% reduction in their own smuggling fees. Thus, instead of paying $1600 for being smuggled into the United States, defendant only had to pay $800. Zanela-Castelan also received $500 for gas and food for the trip.

The Chevy van never made it to New Jersey. The van was pulled over for speeding by a Delaware State Police Officer on I-95. The officer contacted United States Immigration and Customs Enforcement (ICE) after he learned that the co-defendants and the remaining sixteen illegal aliens in the van were not United States citizens. Zanela-Castelan was interviewed by ICE Special

Agents and gave a sworn statement setting forth his involvement in the smuggling operation. In that statement, Zanela-Castelan admitted that he transported the illegal aliens knowing that they were in the United States in violation of law, and also that he received a significant break in his own smuggling fees for agreeing to drive the van from St. Louis to New Jersey.

## II. A SIGNIFICANT DOWNWARD VARIANCE IS UNJUSTIFIED BY THE RECORD

Following the United States Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2006), district courts are required to follow a three-step sentencing process. United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006). The first step is for the district court to calculate the defendant's Guideline sentence precisely as the court would have done so pre-Booker. United States v. Cooper, 437 F.3d 324, 330 (3d Cir. 2006). In this case, both parties agree with the Probation Officer's calculation that the defendant's offense level is 13, and that his criminal history category is I. In the second step, the district court is required to formally rule upon any Guidelines departure motions brought by the parties. United States v. King, 454 F.3d 187, 196 (3d Cir. 2006). Here, neither party has brought a motion for the court to depart from the guidelines. Thus, from a Guidelines standpoint, the parties concur that there are no appropriate grounds from which to deviate from the applicable Guidelines calculation.

In the final step, the district court exercises its discretion by considering the relevant Section 3553(a) factors in setting the defendant's sentence, regardless of whether that sentence varies from the sentence calculated by the Guidelines. Gunter, 462 F.3d at 247. It is at this step that the parties disagree regarding whether a significant variance is justified by the Section 3553(a) factors. Because Zanela-Castelan has raised relevant grounds for a sentencing variance from the applicable Guidelines range, the District Court must give "meaningful consideration" to defendant's arguments

3

in reference to the Section 3553(a) factors. Cooper, 437 F.3d at 329; United States v. Jackson, 467 F.3d 834, 841-42 (3d Cir. 2006). A "significant variance" from the advisory Guidelines range, however, must be "adequately supported by the record." United States v. King, 454 F.3d 187, 195 (3d Cir. 2006); see also Kononchuk, - - F.3d - -, 2007 WL 1322247, *5-6.

In this case, a significant variance is not justified by the record. Defendant pleaded guilty to a serious alien smuggling offense. Human smuggling operations are sophisticated enterprises that traffic between 700,000 and 2,000,000 people each year, yielding approximately $9.5 billion in annual worldwide profits. *Deadly Consequences of Illegal Alien Smuggilng, Hearing Before the House Subcomm. on Immigration, Border Security, and Claims, of the House Comm. on the Judiciary*, 108th Cong. 17, 22 (2003) (statement of Tom Homan, Interim RAC, San Antonio ICE). In the State of Arizona alone, from where Zanela-Castelan entered the United States, alien smuggling is estimated to generate $2 billion-a-year in illegal profits. Dennis Wagner, *Human Trafficking's Profits Spur Horrors*, THE ARIZONA REPUBLIC, July 23, 2006. Such lucrative operations rely upon a number of essential players in the enterprise, including:

- Bosses, who oversee the entire smuggling operation;

- Recruiters in Mexico who meet immigrants in Northern Mexico to negotiate their transportation into the United States;

- Staging managers, who assemble groups of illegal aliens in Mexico and assign guides to cross over into the United States;

- "Coyotes," or Polleros, who smuggle the undocumented immigrants across the border;

- Short-range drivers, who transport illegal aliens from points within the United States to drop-houses;

- Drop-house managers, who obtain biographical and source of payment information from immigrants, and house the immigrants until transportation to the next destination is arranged;

4

- Enforcers, who guard the illegal aliens at the drop houses to ensure that they do not escape without paying smuggling fees;

- Long-range drivers, such as Zanela-Castelan, who transport immigrants from drop-houses to points across the country; and

- Facilitators, who launder money, provide phony immigration documents, secure drop houses, and perform various miscellaneous duties on behalf of the organization.

See *Expert Offers a Glimpse Into the World of Human Smuggling*, THE ARIZONA REPUBLIC, July 23, 2006; *Terms Used in Human-Smuggling Business*, THE ARIZONA REPUBLIC, July 23, 2006. Each of these jobs are essential to the overall success of a smuggling enterprise. The amount of money at stake in these profitable operations has spawned violence between smugglers and law enforcement officers, as well as between different smuggling organizations. Dennis Wagner, *Human Trafficking's Profits Spur Horrors*, THE ARIZONA REPUBLIC, July 23, 2006. In addition, the deplorable conditions faced by illegal aliens who are guided across the border in the desert, herded in large quantities into drop houses where smugglers await payments, and packed into vans and trucks to be shipped to their final destinations, creates the very real possibility of serious injuries and death. See e.g., *Deadly Consequences of Illegal Alien Smuggling*, 108th Cong. 18-21.

Zanela-Castelan may not have been the leader or organizer of the smuggling enterprise, which apparently is based in Arizona; however, he was an indispensable part of the operation. In particular, Zanela-Castelan was the *essential* participant in transporting sixteen illegal aliens from St. Louis to Delaware. Although Zanela-Castelan may argue that someone else may have driven the van had he declined the smugglers' invitation, the fact remains that he ultimately made the decision to drive the van for his financial benefit and should be sentenced accordingly. Additionally, although none of the other sixteen illegal aliens who were packed into the van were injured during the 900-mile trip from St. Louis to Delaware, defendant's decision to drive the van had the potential

5

of placing the passengers in danger, particularly since he drove without a valid driver's license. Indeed, the reason that the co-defendants were detected by law enforcement was because the van was speeding.

Defendant further argues that his impending removal by immigration authorities should be taken into account by the Court in imposing sentence. Defendant, however, has not articulated why his status as an illegal alien is unique from similar defendants. Removal from the United States is always a likely collateral consequence for an illegal alien convicted of a criminal offense. See 8 U.S.C. § 1227(a)(2)(A). In fact, it is a likely consequence for any illegal alien found unlawfully in the United States who was inadmissible at the time of entry. See 8 U.S.C. § 1227(a)(1)(B). Defendant's past immigration history further counsels against a variance due to his immigration status. In October 2005, Zanela-Castelan was arrested by ICE officials for immigration violations. Defendant was released on bail, yet he failed to appear before an Immigration Judge in Pittsburgh, leading to a warrant being issued for his arrest. Given this record of failing to comply with immigration procedures, a variance is not warranted because of the unavoidable consequence that Zanela-Castelan will be removed from the United States at the conclusion of his sentence.

Defendant also contends that his lack of a criminal history merits a downward variance in his sentence. The Sentencing Guidelines generally take into account a defendant's criminal history (or lack thereof) in calculating the sentencing table at Chapter 5, Part A of the Guidelines. United States v. Harvey, 2 F.3d 1318, 1325 (3d Cir. 1993). Defendant does not explain in his sentencing memorandum why his lack of prior criminal exposure differentiates him from similarly-situated defendants who are facing alien transportation charges for the first time.[2]

---

[2]The defendant argues that the "safety-valve" provision of 18 U.S.C. § 3553(f) should apply here. That provision, however, only applies when a defendant is facing certain controlled substances

### III. CONCLUSION

A sentence of twelve months and one day at the bottom of the applicable Guidelines range reflects the defendant's role as an essential player in this offense. Such a sentence offers the deterrent effect of dissuading others from becoming involved in dangerous alien smuggling operations, and helps to ensure that this particular defendant will not engage in criminal conduct in the future. Yet, a sentence at the bottom of the Guidelines range also accounts for defendant's marginally lesser role in this offense in comparison to others who may be more culpable in the overall smuggling enterprise. These factors appropriately lead to a sentence at the low-end of the Guidelines range, but they do not provide a basis for the significant 67% variance sought by Zanela-Castelan.

For these reasons, the Government respectfully requests the Court to impose a sentence of twelve months and one day.

                                              COLM F. CONNOLLY
                                              United States Attorney

                                              /s/ Robert F. Kravetz
                                      By:   Robert F. Kravetz
                                                   Assistant United States Attorney

Dated: May 22, 2007

---

offenses that contain a statutory minimum term of imprisonment. It is inapplicable in defendant's case because his statute of conviction, 8 U.S.C. § 1324(a)(1)(A)(ii) and (a)(1)(B)(i), does not require a mandatory minimum term of imprisonment.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Criminal Action No. 07-21-JJF |
| | ) |
| RICARDO ZANELA-CASTELAN, | ) |
| | ) |
| Defendant. | ) |

CERTIFICATE OF SERVICE

I, Robert F. Kravetz, Assistant United States Attorney for the District of Delaware, hereby certify that on the 22nd of May 2007, I caused to be electronically filed the **Government's Response to Defendant's Sentencing Memorandum** with the Clerk of the Court using CM/ECF. I further certify that a copy of the foregoing was sent via U.S. mail to counsel of record as follows:

Ubel G. Velez
24 Wilmont Mews
P.O. Box 3287
West Chester, PA 19381-3287

/s/ Robert F. Kravetz
Robert F. Kravetz
Assistant United States Attorney